AMERICAN NEWS COMPANY and The Union News Company, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 89, Docket 26857.

United States Court of Appeals
Second Circuit.

Argued Oct. 10, 1961.

Decided Feb. 7, 1962.

---

Lester Lewis Jay and Eugene Frederick Roth, New York City, for petitioners.

Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C. (James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before CLARK, WATERMAN, and MOORE, Circuit Judges.

CLARK, Circuit Judge.

This case, like Grand Union Co. v. F. T. C., 2 Cir., 300 F.2d 92, also decided today, presents the question whether a buyer who knowingly induces and receives from his supplier disproportionate promotional allowances which § 2(d) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(d), forbids the supplier to make, thereby engages in unfair methods of competition in violation of § 5 of the Federal Trade Commission Act, 15 U.S. C. § 45. Many of the issues raised by this appeal were decided in Grand Union, supra. Petitioners make several contentions here, however, which were not presented in that case.

Petitioner Union News Company is wholly owned and controlled by petitioner American News Company. Union is the nation's largest retail newsstand operator, with stands in many important transportation terminals, hotels, and office buildings. The Commission found that it is in a position of near dominance in

the field. In 1958, it operated 930 newsstands, while the next largest firm in the field operated 57 stands.[1] While Union's stands sell candy, cigars, cigarettes, and other items in addition to newspapers and magazines, these proceedings are primarily concerned with practices in connection with sales of certain publications, including magazines, comic books, and pocket books.[2]

There are two main channels of distribution in the national periodical industry. Magazines reach the ultimate consumer either directly from the publisher by subscription or by newsstand sales through a chain of distributors, wholesalers, and retailers. Those copies which are distributed through the latter route go from the publisher to national distributors, who redistribute to wholesalers, who in turn distribute to retailers such as Union. These arrangements are usually exclusive; each publisher uses only one national distributor, in some cases a subsidiary of the publisher itself, and the distributor in turn grants its several wholesalers exclusive territorial rights.[3] The Federal Trade Commission found that in every instance the national publisher controls the prices and terms of sale throughout the distribution process, so that neither the national distributor nor the wholesaler has any power to set prices, terms or conditions of sale to retailers of the magazines. Moreover, since each publication bears a cover price chosen by the publisher, the publisher effectively sets the retail price as well. Reflecting these economic realities Union's negotiations for price adjust-

ment—the subject of these proceedings—were carried on with the publisher or with a national distributor on behalf of the publisher, rather than with the wholesaler from whom Union actually received the magazines.

Petitioners do not deny that they induced and received substantial special payments from publishers; in 1958 these payments amounted to $890,000 an amount equal to almost 17 per cent of Union's total sales of magazines.[4] During the period under review petitioners approached various publishers demanding what were generally called "display promotional allowances" or "promotional allowance rebates" and threatened to discontinue handling a publication if its publisher refused to comply. In the face of this pressure the publishers generally acceded. For example, on June 4, 1956, Mr. Milton Gorbulew, circulation manager of Modern Photography magazine, in response to a demand for a 10 per cent sales rebate on the retail price of the magazine, wrote to Union reluctantly agreeing to grant what Gorbulew called a "stiff rebate." The letter stated: "I assume that if this new rate is unacceptable to us, our magazine would not be distributed on your outlets. In view of this situation we have no recourse but to say yes."

Denominating this activity "a classic example of the misuse of the economic power possessed by large buyers," [5] the Commission found that petitioners had knowingly induced and received from their suppliers discriminatory payments as consideration for services or facilities

1. In 1958, the five principal retail newsstand operators were:

| | | |
|---|---|---|
| Union News Co. | 930 | newsstands |
| ABC Vending Corp. | 57 | " |
| Faber, Inc. | 35 | " |
| Commuter News Co., Inc. | 16 | " |
| Schermerhorn Cigar Stores, Inc. | 16 | " |

2. The complaint charged a violation of § 5 in connection with the sale of cigars, as well as periodicals and pocket books. The Commission found, however, that the evidence did not support this allegation,

and limited its findings to the publications area.

3. While this is the general pattern, it is not uniformly adhered to. Thus some publishers, such as Popular Publications, Inc., distribute directly to wholesalers.

4. In 1958, Union's total sales were approximately $23,940,000, of which approximately $5,280,000 were magazine sales.

5. Union News Co., Trade Reg.Rep. (FTC Complaints, Orders, Stipulations 1960–1) ¶ 29,335 (1961).

furnished by petitioners in connection with the sale of suppliers' goods. The Commission concluded that these payments were unlawful under § 2(d) of the Clayton Act as amended, 15 U.S.C. § 13(d), and held that inducement and receipt of such unlawful payments constituted an unfair method of competition which violated § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The Commission ordered Union and American to cease and desist from the aforementioned practices.

The many questions presented by this appeal from the Commission's opinion and order may be subsumed under five broad issues. First, are these transactions "in commerce" and thus within the scope of § 5 and the Commission's jurisdiction? Second, do the knowing inducement and receipt of payments which violate § 2(d) of the Robinson-Patman Act amendments to the Clayton Act constitute a violation of § 5 of the Federal Trade Commission Act? Third, were the payments in violation of § 2(d)? Fourth, did petitioners *knowingly* induce and receive such payments? Finally, would the fact that petitioners' actions were motivated by a desire to resist illegal price-fixing by the publishers constitute a valid defense under § 5? Petitioners also raise subsidiary issues which will be discussed.

■ *First.* The Federal Trade Commission Act § 5(a)(1), 15 U.S.C. § 45 (a)(1), outlaws "[u]nfair methods of competition in commerce." The gist of the offense charged here is the inducement and receipt of payments violating § 2(d) of the Clayton Act, which makes it unlawful for sellers engaged in commerce to make certain discriminatory payments "in the course of such commerce" to their customers. The publishers and national distributors are engaged in interstate commerce; the promotional allowances attacked here were paid in the course of such commerce. So, too, were the petitioners' inducement and receipt of these payments in commerce. Petitioners contend, however, that their dealings in magazines are not

in interstate commerce, since the interstate shipments of magazines are broken up and repacked by the wholesaler before being shipped to Union's retail outlets. The concise answer to this contention is that it is irrelevant. There is no question of jurisdiction over the parties or over the sale of magazines *per se.* Jurisdiction is asserted over the questioned *practices,* namely the use of the bargaining power of an interstate chain of newsstands to secure promotional rebates from giant interstate publishing firms selling magazines nationally through this chain. These practices are within the jurisdictional scope of §§ 5 and 2(d).

■ *Second.* In Grand Union Co. v. F. T. C., supra, we held that a buyer's knowing inducement and receipt of disproportionate payments for advertising services rendered for its suppliers violated § 5 of the Federal Trade Commission Act. Section 2(d) of the Clayton Act forbids sellers to make such payments, but does not extend its proscription to buyers. This omission, however, was not purposeful. The buyer's receipt of payments is an integral part of the very transaction § 2(d) forbids, and represents the very evil the Robinson-Patman Act was designed to cure. Since the buyer's action in Grand Union secured for it an advantage over competitors which Congress had declared to be *per se* contrary to public policy, we held that the Commission was justified in denominating the buyer's conduct an unfair method of competition in violation of § 5. Similarly, if the payments which Union and American admittedly induced and received were made in violation of § 2(d) and if this inducement and receipt are shown to be "knowing," the FTC's conclusion that they were engaging in unfair methods of competition is correct.

■ *Third.* Petitioners contend, however, that the payments made by the publishers did not contravene § 2(d), because petitioners are not "customers" of the publishers, and because the allowances paid were price adjustments,

not true promotional allowances. The latter contention lacks any merit. In the first place the Commission found that special display rights were indeed often given to publishers who paid the promotional allowances. The publishers who acquiesced in petitioners' demands for promotional rebates expressed the hope that they would get better display service as a result. In their letters and bills petitioners frequently referred to these payments as "promotional allowances." Moreover, even if these payments were all no more than disguised price adjustments, as petitioners contend, they would nevertheless violate § 2(d). Section 2(d) was aimed explicitly at promotional allowances which have the effect of price adjustments. Sen.Rep.No.1502, 74th Cong., 2d Sess. 7 (1936). Allowances for which the services are not performed, or for which the value of the service is lower than the allowance, were prohibited, for these were found to be a major device by which large buyers gained an advantage over their competitors. *Ibid.*

■ For a payment by a supplier to violate § 2(d), 15 U.S.C. § 13(d), it must be paid to a "customer" of the supplier, and be made as compensation for services or facilities furnished "by or through such customer." Petitioners, who purchase magazines not directly from the national publisher, but through the intermediary wholesalers and distributors, claim they are not "customers" of the publishers. We disagree. The term "customer" in § 2(d) should be given the same meaning as "purchaser" in § 2(a) and (e) in order to harmonize parallel sections of a statute aimed at a common purpose. K. S. Corp. v. Chemstrand Corp., D.C.S.D.N.Y., 198 F.Supp. 310; Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955, 189. The cases discussing this requirement under § 2(a), (d), and (e) indicate that there need not be privity of contract

between seller and an ultimate buyer to establish the buyer as a "customer" or "purchaser." If the manufacturer deals with a retailer through the intermediary of wholesalers, dealers, or jobbers, the retailer may nevertheless be a "customer" or "purchaser" of the manufacturer if the latter deals directly with the retailers and controls the terms upon which he buys. K. S. Corp. v. Chemstrand Corp., supra; Champion Spark Plug Co., 50 F.T.C. 30; Dentists Supply Co. of New York, 37 F.T.C. 345; Kraft-Phenix Cheese Corp., 25 F.T.C. 557. Cf. Elizabeth Arden, Inc. v. F. T. C., 2 Cir., 156 F.2d 132, certiorari denied 331 U.S. 806, 67 S.Ct. 1189, 91 L.Ed. 1828.

■■ Petitioners contend that these cases cited do not govern this proceeding, since, as we make out the argument, in those cases the finding that the "seller-customer" relation existed was based solely on the conduct of the seller in proceedings brought against the seller. It is error, petitioners contend, to wish the sins of the seller on the buyer in this wholly different action against the buyer. Petitioners' argument suggests that the function of the "control" requirement is to punish sellers for illegal price control activity. We do not believe that the "indirect customer" doctrine is so grounded. Rather, it seems to stem from a fundamental aim of the Robinson-Patman Act to protect buyers' competitors from the evil effects of direct or indirect price discrimination. See Grand Union Co. v. F. T. C., supra. The method chosen to reach this goal was to forbid *sellers* to make direct or indirect discriminations in price between one purchaser or customer and another, save in certain limited situations. The "customer" or "purchaser" requirement marks one of the outer limits of the seller's responsibility not to discriminate. As long as he exercises control over the terms of a transaction he is held to this duty;[6] otherwise the requirement of

6. But cf. Klein v. Lionel Corp., D.C.Del., 138 F.Supp. 560, affirmed 3 Cir., 237 F. 2d 13, affirming a summary judgment for defendant in a treble-damage action

the statute could be easily avoided by use of a "dummy" wholesaler. If there is no control the duty naturally ends, for the manufacturer has no power to protect the buyer's competitors. See Baim & Blank, Inc. v. Philco Corp., D.C. E.D.N.Y., 148 F.Supp. 541. Since the requirement is imposed not to punish sellers for their conduct, but to effectuate the purpose of giving protection to buyers' competitors, the "indirect customer" doctrine should apply whether the proceeding is brought against buyer or seller. If control is found, then Union is a "customer" under § 2(d). The Commission found that the seller "fixes the prices, terms, and conditions of sale and negotiates directly" with Union; therefore Union is a "customer" of the publishers.

■ ■ *Fourth.* Petitioners assert that there is insufficient evidence to support the Commission's finding that they knew that payments which they induced and received were not available to their competitors on a proportionally equal basis. They point out that the negotiations surrounding all attempts by retailers to secure price adjustments were carried on individually, in secret, and were marked by fraudulent representations by the publishers, so that petitioners were unable to learn what terms their competitors were receiving. The test of whether a buyer has knowledge that payments he induces and receives are illegal was laid down for cases brought under § 2(f) by the Supreme Court in Automatic Canteen Co. of America v. F. T. C., 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454. By analogy this test is applicable in these § 5 proceedings. See Grand Union Co. v. F. T. C., supra. Although knowledge must be proved, it

need not be by direct evidence; circumstantial evidence, permitting the inference that petitioners knew, or in the exercise of normal care would have known, of the disproportionality of the payments is sufficient. Automatic Canteen Co. of America v. F. T. C., supra, 346 U.S. 61, 80, 73 S.Ct. 1017. Here the record reveals a series of interrelated facts which, taken as a whole, indicate that the Commission's findings are supported by substantial evidence. Petitioners have a position of near-dominance in the retail newsstand field. They insisted on receiving rebates which represented a steep increase over promotional allowances customarily paid. Publishers often resisted these requests on the ground that the allowances paid would exceed those granted to petitioners' competitors. Finally, the Commission found that not one retailer competing with Union actually received a payment or allowance at a rate "proportionally equal to that paid to petitioners."

■ *Fifth.* Petitioners claim that their attempts to secure rebates or promotional allowances were a reaction to illegal price-fixing by the publishers, and that for that reason they should not be found to have engaged in unfair methods of competition. But resort to practices outlawed by the antitrust laws cannot be justified by the fact that the practices were a defense to illegal activity. Fashion Originators' Guild of America v. F. T. C., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949. Moreover, we have held today that inducement and receipt of payments which violate § 2(d) are a *per se* violation of § 5, so that there can be no question of the "reasonableness" of petitioners' activity. Grand Union Co. v. F. T. C., supra.

brought by Klein, a retailer, who purchased defendant Lionel's products through a wholesaler, while competing retailers were able to purchase directly from Lionel and thereby receive a greater discount. Klein alleged no direct dealings between himself and Lionel and did not show that Lionel controlled the terms set by the wholesaler; and on appeal he

raised the point that Lionel's products were fair-traded at the wholesale level and that Lionel therefore did exercise "control" under the rule in Kraft-Phenix Cheese Corp., 25 F.T.C. 557. The Third Circuit rejected the claim, stating that the Kraft-Phenix doctrine was not applicable in such an action.

■ *Sixth.* We have examined petitioners' remaining substantive contentions and find them groundless in the light of our view of the major issues herein. Petitioners also state that the Commission's cease and desist order is "ambiguous, overreaching and oppressive." To the extent that the order extends beyond the actual inducement and receipt of display and promotional allowances—the specific practices involved in these proceedings—we agree that the order is too broadly drawn. Grand Union Co. v. F. T. C., supra. Moreover, the order forbids an attempt to induce, or inducement of, illegal payments without receipt thereof. Since petitioners both induced and received the payments here, for the reasons stated in Grand Union Co. v. F. T. C., supra, the order should be so limited. Neither the Commission nor the courts have held that an attempt to induce or inducement (if the two are distinguishable), without a concomitant receipt of illegal payments, violates § 5. In Grand Union Co. v. F. T. C., supra, we explicitly refused to pass on these questions, since the petitioner there had received payments which violated § 2(d); and we think we should do the same here, where the petitioner is in like case. Unless and until there is a definite ruling thereto, inducement or attempted inducement alone cannot be considered to be an "identical illegal practice" which the Commission may prohibit under the rule in Niresk Industries, Inc. v. F. T. C., 7 Cir., 278 F.2d 337, certiorari denied 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104.[7]

■ Petitioners contend that the order places undue burdens on them by forbidding inducement and receipt of payments when they know, or *should know,* that proportional payments are not *"affirmatively offered* or otherwise made available" to their competitors. They attack specifically the provisions we have italicized. There is nothing in the Supreme Court's opinion in Automatic Canteen Co. of America v. F. T. C., supra, 346 U.S. 61, 73 S.Ct. 1017, 97 L. Ed. 1454, which precludes the imposition of a duty of reasonable inquiry upon a buyer. Indeed, that opinion stated that the Commission might find knowledge under § 2(f) that payments induced and received were not cost-justified (the issue there) if it showed two things: first, that the buyer knew of a price differential, and second, that one familiar with the trade should know that such a differtial could not be cost-justified. Automatic Canteen Co. of America v. F. T. C., supra, 346 U.S. 61, 81, 73 S.Ct. 1017. Nor can there be any objection to including the term "affirmatively offered." Petitioners seem to feel that this provision makes the order more onerous and imposes a requirement on sellers not called for by § 2(d). Whatever may be the merits of petitioners' contention that § 2(d) imposes no duty of affirmative offering on sellers, inclusion of this provision cannot prejudice the buyer. As the order now reads, this clause does not change what sellers must do, but simply defines the obligation of the buyer to learn whether payments are "proportionalized." If he is apprised of sufficient information about payments which he induces and receives to create a duty of further inquiry, the buyer, under this order, must see first if the payments are affirmatively offered to his competitors on a proportionally equal basis; if not, the order indicates he may have a further duty to see whether they are "otherwise made available."

The decision of the Commission is affirmed. Pursuant to Rule 13(*l*), Rules of the United States Court of Appeals for the Second Circuit, the Commission shall enter an order "in conformity with the opinion," to which petitioners may

7. We find nothing in the recent opinion in F. T. C. v. Henry Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353, which is inconsistent with our finding that the Commission's orders are too broad. As that case suggests, in situations where agency orders are subject to automatic enforcement in civil suits brought by the Attorney General, these orders must be clear and specific.

object by timely filing of a counter-proposal.

MOORE, Circuit Judge (dissenting).

Just as the decision in Grand Union Co. v. F. T. C., decided today, subjected a buyer to sanctions not imposed by Congress under the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(d), so too does this decision resort to the generalities of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("unfair competition") to make unlawful that which Congress, although afforded an opportunity to do so, has not forbidden. Under the guise of restraining threats to competition, the result reached by the majority here, in my opinion, has a diametrically opposite effect. The facts clearly support this conclusion.

Petitioners sell at retail newsstands books and magazines published by the publishers here involved. Dissatisfied with the terms of the purchase contracts, petitioners demanded better terms, primarily rebates and compensation for promotional allowances. Apparently, petitioners' purchasing power was such that the publishers, although protesting in some instances, agreed. In any free and competitive economy, both buyer and seller should have the right to consummate the purchase transaction only if mutually satisfied as to terms. A buyer ought to be able to drive as hard a bargain as business expediency warrants; a seller should be able to exact the best terms as possible from his point of view. Freedom to agree or disagree, I trust, has not been legislated out of existence—by Congress at least. Congress, however, has, in the interest of protecting the buyer in a less advantageous bargaining position, declared that the benefits achieved by the strong shall also be accorded proportionally to the weak. But Congress has never said that a buyer can bargain for better terms only at his peril.[1] Any such law would completely stifle the competitive system. By way of illustration, a buyer desirous of obtaining certain products for 10 cents a pound less might demand such a reduction either in price or in promotional allowances. The buyer may be one of 10,000 customers of the seller which customers may range from mass buyers to a country grocery store in a small hamlet. Yet the decision of the Commission and the majority for all practical purposes precludes the buyer from asking for better terms and, accepting them if granted, unless he first inquires of the seller whether the terms are being made available to others and then to verify any such assurance canvasses all the seller's customers to ascertain whether the seller has made the terms of his bargain available to them.

[1] The Supreme Court made this point clear in Automatic Canteen Co. v. F. T. C., 346 U.S. 61, 73, 77, 78 S.Ct. 1017, 1024, 1953, when it said:

"Not only are the arguments of the Commission unsatisfying, but we think a fairer reading of the language and of what limited legislative elucidation we have points toward a reading of § 2(f) making it unlawful only to induce or receive prices known to be prohibited discriminations. For § 2(f) was explained in Congress as a provision under which a seller, by informing the buyer that a proposed discount was unlawful under the Act, could discourage undue pressure from the buyer. Of course, such devices for private enforcement of the Act through fear of prosecution could equally well have been achieved by providing that the buyer would be liable if, through the seller or otherwise, he learned that the price he sought or received was lower than that accorded competitors, but we are unable, in the light of congressional policy as expressed in other antitrust legislation, to read this ambiguous language as putting the buyer at his peril whenever he engages in price bargaining. Such a reading must be rejected in view of the effect it might have on that sturdy bargaining between buyer and seller for which scope was presumably left in the areas of our economy not otherwise regulated. Although due consideration is to be accorded to administrative construction where alternative interpretation is fairly open, it is our duty to reconcile such interpretation, except where Congress has told us not to, with the broader antitrust policies that have been laid down by Congress."

The order proposed would, in effect, require that the potential buyer not enter into his purchase contract until he has ascertained that the prospective seller has "affirmatively offered" proportionally equal terms to all his other customers competing in the sale of his products. To comply with the Commission's order after the buyer and seller had agreed upon their terms, the buyer would have to demand a list of all the seller's customers. This probably would not be forthcoming. However, if it were, the buyer would then have to write to all competing customers disclosing in this competitive age the terms of his proposed purchase and inquire whether the seller had "affirmatively offered" the same, or proportionally equal, terms to them. The more cautious buyer would request proof of such affirmative offer from each of his competitors by affidavits; the more incautious might risk an affidavit from the seller, listing all proportionally equal arrangements made with other customers. Far-fetched though this hypothetical situation may seem, reality is rudely injected into the hypothesis in reading, "Nor can there be any objection to including the term 'affirmatively offered.' ", because it "simply defines the obligation of the buyer to learn whether payments are 'proportionalized.' " "If he is apprised of sufficient information [whatever that is] * * * to create a duty of further inquiry, the buyer, under this order, must see first if the payments are affirmatively offered to his competitors on a proportionally equal basis; if not, the order indicates [that] he may have a further duty to see whether they are 'otherwise made available.' " (Maj.Op., p. 111). Here then is a direct mandate to all buyers pursuing their supposed right to bargain for better terms than the seller proposes or had previously given that they cannot accept such terms as may be agreed upon unless the buyer "sees first" what the nature of the businesses of hundreds of the Seller's customers may be and then tries to analyze whether the Seller has offered propor-

tionally equal terms to all. The mere statement of such a proposition should be an adequate answer as to why Congress imposed no such burden on buyers. Such a rule would place the bargaining power exclusively in the hands of sellers and be the very antithesis of competition because no buyer could meet the burden. Furthermore, inability of one buyer to seek such benefits would actually prejudice all other buyers because if he were successful the seller would be obliged under § 2(d) to confer similar benefits on them.

No prohibition against seeking or receiving promotional allowances even though they turn out to be disproportional has been written into either Section 2(d) or 2(f). There was good reason for the seller-buyer differences in the two sections. Far from being "inadvertent," a consideration of the unequal position of the parties must have led to the distinct treatment accorded to each in these sections. A seller is in a unique position to know whether he is giving proportionally equal allowances to his customers. The customers could not possibly have such facts available. Ascertainment of price discrimination would be comparatively simple in contrast to obtaining information as to a seller's proportionally equal treatment of buyers. Yet even as to price the Commission must come forward with proof that the effect of the discrimination may be substantially to lessen competition and cannot rely on a *per se* violation. In short, inducement and receipt by a buyer become a violation only after the Commission has sustained its burden and after the buyer has had an opportunity to avail itself unsuccessfully of permitted defenses. Automatic Canteen Co. v. F. T. C., 346 U.S. 61, 73 S.Ct. 1017 (1953). I cannot conceive that Congress intended that the Commission could escape these requirements by prosecuting specific violations of one law (the Clayton Act) under the terms of another (the FTC Act). As Professor Handler says in his "Review of Antitrust Developments,"

**114**

The Record, Association of the Bar, New York City, Vol. 17, No. 7, p. 403:

"Nowhere in the voluminous literature on the history and administration of the Federal Trade Commission Act nor in the comprehensive jurisprudence on unfair methods of competition will one find support for the view that the Commission can avoid limiting statutory language by resort to the broader contours of Section 5."

He continues on p. 406:

"There is no suggestion in either statute that the provisions of the Clayton Act are to be merged with Section 5 and lose their identity as the careful expression of the legislative will on the legitimacy of the practices to which they relate."

I would accept the Handler critique as a sound expression of proper scope of Commission and court powers expressed in his conclusion that (p. 408):

"Congress vested the Commission with a broad and flexible mandate. But it did not endow it with the power to legislate. In the final analysis a democracy cannot permit its laws to be rewritten by administrative agencies or the executive. Where administration discloses defects or limitations in the laws drafted by Congress with which the techniques of interpretation are unable to cope, the remedy is to request supplemental legislation from the elected representatives of the people who, under our system of government, are the final arbiters of national policy. This has been the settled practice in the antitrust field where numerous legislative changes have been made over the years."

In my opinion, the Commission has rewritten sections 2(d) and 2(f), thus creating laws which Congress for good reason has not enacted. The petitioners have not violated those laws which Congress chose to enact and, hence, I would set aside the Commission's order.