543 F.2d 1019
 1976-2 Trade Cases 61,103
 FLM COLLISION PARTS, INC., Plaintiff-Appellee-Cross-Appellant,
v.
FORD MOTOR COMPANY and Ford Marketing Corporation,
Defendants-Appellants-Cross-Appellees.
 Nos. 1192, 1260, Dockets 76-7161, 76-7202.
 United States Court of Appeals,
Second Circuit.
 Argued June 16, 1976.
Decided Sept. 30, 1976.
 
 Robert MacCrate, William M. Dallas, Jr., Sullivan & Cromwell, Stanley D. Robinson, Michael Malina, Kaye, Scholer, Fierman, Hays & Handler, New York City, William A. Zolbert, Detroit, Mich. (Office of General Counsel, Ford Motor Co., of counsel), for defendants-appellants.
 David Jaroslawicz, New York City (Alfred S. Julien, Stuart A. Schlesinger, Julien & Schlesinger, P. C., David L. Wasser, New York City, of counsel), for plaintiff-appellee.
 Before MANSFIELD, OAKES and GURFEIN, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 In this civil anti-trust suit for damages in the Southern District of New York by FLM Collision Parts, Inc. an independent wholesaler of automobile parts, against Ford Motor Co. and its wholly owned subsidiary, Ford Marketing Corporation (herein collectively referred to as "Ford"), the subject of attack is a Ford incentive allowance plan under which Ford grants to each of its franchised dealers a discount on the dealer's purchases of "crash parts" for resale to independent automobile repair shops but not on the dealer's purchases for its own use or for resale to other classes of customers, including FLM. FLM claims that this pricing practice amounts to a price discrimination in violation of § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), and also constitutes a conspiracy in restraint of trade violative of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and a monopolization of the market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.
 
 
 2
 After trial of the action before Thomas P. Griesa, Judge, sitting without a jury, he handed down an opinion, reported at 406 F.Supp. 224, agreeing with FLM that the incentive payment plan was a form of price discrimination and thus a violation of § 2(a) of the Robinson-Patman Act. He dismissed FLM's Sherman Act claims, however, finding that the plaintiff had failed to prove its allegations of conspiracy and monopolization. A supplemental opinion awarded FLM treble damages of $874,506, $135,000 in attorneys' fees, and injunctive relief. Ford appeals from this judgment, and FLM cross-appeals from the dismissal of its Sherman Act claims. We hold that the district judge erred in finding price discrimination in violation of § 2(a), since Ford's incentive plan treated all of its purchasers equally, and accordingly we reverse the judgment in favor of FLM. We affirm the dismissal of the Sherman Act claims.
 
 THE FACTS
 
 3
 "Crash parts", as the name indicates, are fenders, grills, and other sheet metal parts used principally to repair automobiles damaged in collisions. They are custom-designed for particular years and models of automobiles, and Ford is the sole source of such parts for Ford cars. The distribution system of the parts thus begins with Ford, which makes some parts itself and licenses the manufacture of other parts. Ford sells its crash parts exclusively to its franchised Ford dealers, of which there are some 6800 in the United States. The dealers use some of the parts in their own repair shop operations, in effect selling them directly to the car owner and to this extent functioning as retailers. With respect to the balance the Ford dealers function as wholesalers, reselling the parts to independent auto repair shops for use in those shops' repair operations and to other users such as owners of large fleets of automobiles and insurance companies.
 
 
 4
 FLM entered the crash parts business in 1965 as an independent wholesaler. Its request to buy crash parts directly from Ford was refused, since Ford sold parts only to its franchised Ford dealers. FLM then made arrangements to buy Ford parts from a franchised Ford dealer, Central Lincoln Mercury Corp. ("Central"). The FLM-Central agreement allowed FLM to buy the parts at 2% above the price Central paid Ford for them. FLM then in turn resold the parts to independent repair shops.
 
 
 5
 Prior to 1968, Ford priced its crash parts to its franchised dealers at approximately 60% of Ford's suggested list price.[1] Thus, a part retailing at $10.00 would be sold by Ford to its dealers, including Central, at $6.00, which was described as the "dealer net" price (i. e. 40% off the suggested list price). Central would resell the part to FLM at $6.12. (Dealer net plus 2%). While FLM was thus at a slight price disadvantage in competing with Ford dealers for sales of crash parts to independent repair shops, its sales grew from $245,738 in the fiscal year ending Sept. 30, 1966 to $389,987 in the fiscal year ending Sept. 30, 1968. However, FLM did not show any net profit over this period.
 
 
 6
 Putting FLM to one side for the moment, Ford's pre-1968 distribution system for crash parts clearly put independent auto repair shops at a disadvantage in competing with Ford-franchised dealers for repair jobs on Ford cars. This arose from the fact that while Ford dealers could buy the parts needed for such repairs from Ford at the "dealer net" price (e. g., $6.00 for a part with a $10.00 suggested retail) the independent repair shops had to buy the same part from a Ford dealer at dealer net plus whatever markup the Ford dealer might choose to add. Thus, if a Ford dealer charged a 10% markup on the parts it resold, an independent repair shop would have to pay $6.60 for the part which the Ford dealer could buy for $6.00. This situation attracted the attention of the Federal Trade Commission, which informed Ford that it considered the prices charged to independent repair shops to be an unfair trade practice in violation of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The FTC never began formal proceedings against Ford; the matter was settled when Ford adopted the "wholesale incentive" allowance to dealers which was designed to equalize the prices at which independent repair shops could obtain Ford parts with the prices paid by Ford dealers for the same parts.[2]
 
 
 7
 Under the wholesale incentive plan Ford sold crash parts to its dealers at lower prices when they were resold to independent auto repair shops than when they were retained by the Ford dealer for use in his own repair operations. For a part having a $10.00 suggested retail list price the Ford dealer would still pay $6.00 when he bought it for use in his own repair shop. However, when he bought it for resale to an independent repair shop he would receive back from Ford an incentive allowance of 20% of the dealer net price, reducing the Ford dealer's bottom line price to $4.80 (dealer net of $6.00 less 20%).[3] Thus, under the plan the independent repair shop would be able to buy the part at $4.80 plus the Ford dealer's markup, which allowed him to compete effectively for repair business with the Ford dealer who would have a dealer net cost of $6.00 for the same part when retained for use in his repair operations.
 
 
 8
 The incentive payment plan as originally adopted in 1968 allowed sales of crash parts by Ford dealers to independent wholesalers to qualify for the incentive payments to the dealers. Central, which now charged FLM a 3% markup over dealer net on crash parts, simply paid over to FLM the incentive payments it received on parts sold to FLM. Thus FLM's cost for the part with a $10.00 suggested retail price was now $4.68. ($6.00 dealer net plus $.18 (Central's 3% markup) less $1.20 (the 20% incentive payment)). However, the objective of the incentive plan, which was to reduce prices to independent repair shops, was not initially achieved, principally because neither Ford dealers nor FLM made any appreciable reduction in their resale prices to such shops. The principal effect of the flow-through of the incentive payments to FLM was to increase its profitability dramatically; from a net loss of $769 in fiscal 1968 FLM leaped to a net profit of $25,418 in fiscal 1969, and enjoyed similar profits in the next three years. Thus FLM rather than the independent repair shops became a principal beneficiary of the plan.
 
 
 9
 Beginning in 1969, the amounts Ford paid out in wholesale incentive allowances on crash parts, and on other types of parts for which it made similar incentive payments, ran higher than expected. Worried that Ford dealers might be claiming incentive allowances to which they were not entitled, Ford audited the accounts of 37 dealers whose claims for incentive payments ran especially high. Central was one of the dealers selected for an audit; Ford examined its books and those of FLM as well. While the audit of Central and FLM disclosed some improper claims, they were insubstantial in amount, and Ford concedes that this audit and a similar one made in 1970 showed that Central and FLM were complying with the terms of the incentive program.
 
 
 10
 While Central and FLM may not have been engaged in any improper use of the incentive plan, the same could not be said of all of Ford's dealers. Ford's statistical analysis of the overall results of the 37 audits conducted in 1969 indicated that as much as.$2.1 million of the $44.5 million in incentive payments claimed might be improper. Among other things, some dealers were selling parts to wholesale intermediaries and then claiming an incentive allowance for doing so, even though the wholesaler then resold the part to another Ford-franchised dealer. As a result of the audit, Ford began considering ways to alter the incentive payment plan to avoid the use of such tactics. In July 1971, it promulgated a revised version of its incentive plan, under which Ford dealers would be eligible for the payment only when they resold parts to an independent repair shop, not when they resold them to wholesalers such as FLM or to other classes of customers such as fleet owners and insurance companies. It is this revision of the plan which is at the heart of the present suit.[4]
 
 
 11
 Despite the fact that the revised version of the incentive plan would not allow incentive payments on parts resold to wholesalers such as FLM, Atlas Lincoln Mercury, ("Atlas"), the corporate successor to Central, continued to claim incentive allowances on parts it resold to FLM under the same arrangements as the latter had with Central. This continued through mid-1972 when Ford discovered that the payments were being claimed for sales to FLM and proposed to recover from Atlas some $24,000 in payments made to Atlas on account of its sales to FLM. Atlas then withheld its payments of incentive allowances over to FLM, which retaliated by withholding monies due to Atlas. In the end, though Ford refused to allow any further incentive payments to Atlas on account of sales to FLM, it agreed not to recoup the past payments to Atlas. Atlas and FLM ceased doing business together.
 
 
 12
 Since 1972, FLM has purchased crash parts from other Ford dealers, paying the 5% above dealer net cost. Under the present system, a Ford dealer selling a part to FLM will receive no incentive payment on it. Thus, a $10.00 retail part resold to FLM will cost the dealer $6.00 (the dealer net price), and FLM a total of $6.30, including the Ford dealer's 5% markup. When, however, the part is resold to an independent repair shop, it will cost the Ford dealer only $4.50 (the dealer net price, less the incentive payment, which was raised to 25% in 1970). The difference between the cost to FLM and the cost to the Ford dealers has put FLM under pressure in the competition for resales to independent repair shops. While FLM's net sales for fiscal 1973 rose over its 1972 sales, it experienced a net loss of $85,707 for the 1973 year, as compared to a $21,091 profit the year before. Preliminary estimates introduced at trial indicated that during fiscal 1974, FLM's sales fell to $694,000, some $100,000 less than in 1973.
 
 DISCUSSION
 The Robinson-Patman Claim
 
 13
 Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, provides in pertinent part that:
 
 
 14
 "It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . " 15 U.S.C. § 13(a).
 
 
 15
 The district judge concluded that Ford's incentive payment plan as it functioned after the 1971 change violated the Act's prohibition of price discrimination, stating:
 
 
 16
 "It is not disputed that, since November 1972, Ford has charged to Ford dealers who sell to FLM a higher price than Ford charges for the same crash parts when a Ford dealer sells directly to an independent body shop. Putting aside for the moment the question of the purpose of Ford's price differentials, it would appear at least that the basic elements of a Section 2(a) violation are made out. Ford charges different prices to different purchasers Ford dealers for the same crash parts." 406 F.Supp. at 236.
 
 
 17
 We disagree with this conclusion. The district court's holding runs contrary to the plain language of the Act, which limits its prohibition to price discrimination "between different purchasers." The statute thus proclaims in substance that a seller must extend equality of treatment to its competing purchasers and may not discriminate in price between them. However, it does not prohibit the seller from offering different prices to each of its purchasers, such as one price when he functions as a retailer and a lower price when he functions as a wholesaler, provided all competing purchasers are treated equally. In this case Ford, the seller, treated all of its purchasers (franchised dealers) equally, offering each the same prices as those offered to every one of its other dealers. Hence Ford's incentive payment plan did not discriminate against any of its purchasing dealers. All Ford dealers could receive the incentive payments resulting in lower prices for parts they resold to independent repair shops, and all were denied these payments when the parts were not so resold. For instance, FLM's suppliers, Central or Atlas, are entitled to the incentive payments from Ford when they resell its crash parts to independent auto repair shops, and there is no indication that under its amended plan Ford allows the incentive payments to any Ford dealers for resale of parts to customers (such as FLM) who are not independent auto repair shops. In short, while the incentive payment plan did not set a single uniform price for all types of sales made by Ford to its dealers, it was administered with an even hand, without any discrimination among the dealers who purchased from Ford.
 
 
 18
 Relying on FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960); FTC v. Fred Meyer, Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); and Mueller Co. v. FTC, 323 F.2d 44 (7th Cir. 1963), cert. denied, 377 U.S. 923, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964), FLM argues that § 2(a) obligates Ford to charge one uniform price to each of its customers and that dual pricing, even though equally available to all, is discriminatory. We disagree and fail to find support for such a rule in these or any other authorities. The statement quoted from the Court's opinion Anheuser-Busch to the effect that "a price discrimination within the meaning of (s2(a)) is merely a price difference" is taken out of an entirely different and distinguishable context, which renders it wholly inapplicable to this case. There the court was dealing with a claim of primary-line territorial price discrimination under which Anheuser granted lower prices to dealers in the St. Louis area, but not to those located elsewhere, for the purpose of driving out competition. The court's quoted comment was in response to Anheuser's argument that the FTC was obligated to prove that the lower prices to the St. Louis customers were below cost or unreasonably low and were subsidized by the higher prices charged to others. See id., 363 U.S. at 548-49, 80 S.Ct. 1267, 1274. No such charge or situation exists here; Ford makes the same prices available to all its customers.
 
 
 19
 Were there any doubt about the matter, the Supreme Court's later decision in FTC v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966), makes it clear that the language in Anheuser-Busch does not imply that the Robinson-Patman Act requires the uniform pricing rigidity FLM here asks but, on the contrary, permits a seller to offer dual prices to its customers on an equal basis. Although the Borden Company there charged purchasers a higher price for its brand-name milk than it charged for private label brands "of like grade and quality" within the meaning of Section 2(a), the court remanded the case for a determination of "whether the differential under attack is discriminatory within the meaning of the Act," and of whether Borden had established any of the statutory defenses. Id. at 646, 86 S.Ct. at 1098. Thus it was recognized that the difference in price would not fall under the Act's ban on price discrimination if all purchasers were given an equal opportunity to purchase the less expensive milk. See id. at 641 n. 4; 643,86 S.Ct. 1092.[5] In his dissent on the "like grade and quality" issue, Justice Stewart further underlined the point that the Act requires only equal treatment of all purchasers, not a single unvarying price:
 
 
 20
 "(T)he existence of price discrimination is an issue that remains open in the Court of Appeals. If Borden is able to demonstrate that the price differential between its premium and private label brands is not a price discrimination, the inquiry by the Commission is at an end, and no issue of injury to competition or cost justification under § 2(a) is reached. Nothing in FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385, a case concerned only with territorial price discrimination, requires an equation in all circumstances between a price differential and price discrimination. So long as Borden makes private label brands available to all customers of its premium milk, it is unlikely that price discrimination within the meaning of § 2(a) can be made out." Id. at 659 n. 17, 86 S.Ct. at 1105 (emphasis added).
 
 
 21
 Thus, even when a seller has a dual pricing system, if the lower price is available to all purchasers, not only in theory but in fact, see FTC v. Morton Salt Co., 334 U.S. 37, 42, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), there is no violation of § 2(a).[6]
 
 
 22
 In short the Act, as its language indicates, requires equality of treatment among purchasers, but it does not require a seller to adopt a single uniform price under all circumstances. Cf. Sun Cosmetic Shoppe, Inc. v. Elizabeth Arden Sales Corp., 178 F.2d 150, 152 (2d Cir. 1949) ("The Act does not undertake to forbid a seller to grant favors to his customers . . . it only insists that the distribution, if any, shall be equal.") This principle has been applied in cases which found no violation of § 2(a) in pricing plans which, though varying prices according to different terms of sale, were administered equally to all purchasers. See Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635, 643 (9th Cir. 1969) (discounts for advance deposits); Boss Manufacturing Co. v. Payne Glove Co., 71 F.2d 768 (8th Cir.), cert. denied, 293 U.S. 590, 55 S.Ct. 104, 79 L.Ed. 684 (1934) (dual product lines); William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 389 F.Supp. 1334, 1341 (N.D.Cal.) (dictum) (private label breads), rev'd on other grounds, 526 F.2d 86 (9th Cir. 1975); F. Rowe, Price Discrimination Under the Robinson-Patman Act 97-98 (1962).
 
 
 23
 Accepting as we do the Supreme Court's observation in FTC v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968), that the Robinson-Patman Act should not be construed "in a manner which runs counter to the broad goals which Congress intended it to effectuate,"[7] we find nothing in that decision to support FLM's position here and nothing in the present case to indicate that Ford's incentive allowance plan is aimed at defeating or circumventing the Act. In the first place, Fred Meyer did not involve § 2(a)'s applicability to price adjustments, much less to any of the type challenged here. The question there was whether promotional allowances paid by a manufacturer directly to certain retailers, but not to intervening wholesalers who resold to other competing retailers, violated § 2(d) of the Act, 15 U.S.C. § 2(d).[8] In holding that the manufacturer was required to give the same promotional allowances to retailers purchasing from the wholesalers as those given by it directly to retailers, the Court did not suggest that it intended, by analogy or otherwise, to interpret § 2(a) as requiring a manufacturer to equalize prices charged to those performing different functions in the line of distribution. Indeed, to do so, as Justice Harlan's dissent in Fred Meyer noted, 390 U.S. at 361, 88 S.Ct. 904, would be to run afoul of the Sherman Act. If, in order to avoid violation of the Robinson-Patman Act, Ford were required to fix the prices at which FLM purchased parts from Ford dealers so that the prices to both would be equalized, Ford would be open to the charge of illegal price fixing.
 
 
 24
 We do not suggest or imply that, if a manufacturer grants a price discount or allowance to its wholesalers (whether or not labelled "incentive"), which has the purpose or effect of defeating the objectives of the Act, § 2(a)'s language may not be construed to defeat it. But that is quite different from the situation before us. Here the incentive allowance is given by Ford to its dealers in recognition of the fact that in reselling to independent repair shops the dealer acts as a wholesaler rather than a retailer. Although denial of the allowance on resale of parts to others may have the practical effect of placing a floor under the price at which dealers can resell to intermediate wholesalers, the same could be said generally of standard functional discounts, the legality of which is not questioned. See Rowe, Price Discrimination Under the Robinson-Patman Act 173-174 (1962); Shniderman, "The Tyranny of Labels" A Study of Functional Discounts Under the Robinson-Patman Act, 60 Harv. L.Rev. 571 (1947); Doubleday and Co., Inc., 52 F.T.C. 169, 207-208 (1955).
 
 
 25
 The record furthermore fails to provide the basis for an inference that Ford's incentive payment plan has been simply a device to achieve indirectly a price discrimination forbidden by the Act. The original plan was adopted in response to the FTC's concern that independent auto repair shops be permitted to obtain crash parts at prices that would enable them to compete with Ford dealers in the repair business. The revision of the plan of which FLM complains came after Ford's audits disclosed that under similar incentive plans involving other types of automobile parts[9] dealers were, in effect, selling to each other through the medium of outside wholesalers, thus allowing Ford dealers to obtain the parts at the same price or less than independent shops and undercutting the objective of the plan. While FLM was not involved in such dealings, its position as an intermediary raised the possibility of this problem.[10] In these circumstances, it was not unreasonable for Ford to make a general change in its incentive plans, both those in which such difficulties had arisen, and the crash parts plan, where they were posed as a potential problem. Thus the record indicates that the 1971 revision of the plan was an attempt to further implement Ford's original intention of funnelling crash parts at reasonable prices to independent repair shops so as to improve competition in the auto repair business, and was not a device to circumvent the Act.
 
 
 26
 Nor do we find support for FLM's contention in Mueller Co. v. FTC 323 F.2d 44 (7th Cir. 1963), cert. denied, 377 U.S. 923, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964). There the seller had divided its purchasers into two classes regular and "stocking" jobbers. It granted an extra 10% discount to stocking jobbers to compensate them for their expenses in maintaining warehouse stocks of the seller's product. However, not all jobbers were able to become stocking jobbers and thus take advantage of the 10% discount. Specifically the FTC found that the seller "discriminated in the selection of stocking jobbers." Id. at 45. In affirming the FTC's finding on this point, and rejecting the petitioner's argument that there was no price discrimination since all jobbers could become stocking jobbers, the Seventh Circuit stated that:
 
 
 27
 "There were no objective standards to guide regular jobbers in qualifying as acceptable and there is substantial evidence to support the Commission's finding as well as evidence that petitioner's decisions on this point were influenced by whether it had already adequate distribution 'in that particular area' and by its concern to protect 'old established jobbers.' Theoretically, these discounts were available to all, but functionally they were not." 323 F.2d at 46. (Citation omitted)
 
 
 28
 Thus the gravamen of the discrimination found in Mueller was not the provision of the 10% discount to jobbers as compensation for their wholesaling services, but rather the fact that eligibility to enter this favored class was only selectively recognized and not made equally available to all jobbers. Here, in contrast, Ford did not arbitrarily select some of its dealers and limit incentive payments to them. Rather, such payments were available to all Ford dealers purchasing from Ford. Mueller thus simply reaffirms the principle that treatment of purchasers must be even-handed. Having treated its dealers equally here, Ford fulfilled its duties under the Act.
 
 
 29
 We need not dwell at length on FLM's alternative suggestion understandably brief that it should be treated as an "indirect purchaser" from Ford and thus entitled to the same prices as those charged by Ford to its dealers. The "indirect purchaser" doctrine originated in Kraft-Phenix Cheese Corp., 25 F.T.C. 537 (1937), as a means of preventing a manufacturer from insulating itself from Robinson-Patman liability by using a "dummy" wholesaler to make sales at terms actually controlled by the manufacturer. See American News Co. v. FTC, 300 F.2d 104, 109-10 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962); F. Rowe, supra, at 57-59. The doctrine comes into play when the manufacturer "deals directly with the retailer and controls the terms upon which he buys." American News Co., supra, 300 F.2d at 109; see K. S. Corp. v. Chemstrand Corp., 198 F.Supp. 310 (S.D.N.Y.1961); Kraft-Phenix Cheese Corp., supra.
 
 
 30
 Ford's direct dealings with FLM were at best fragmentary,[11] and the company did not attempt through the medium of a suggested price or otherwise to set the prices at which its dealers would sell crash parts to FLM. The most that can be said is that as a practical matter Ford's wholesale price to its dealers serves as a floor for their resale prices. As Judge Griesa noted, see 406 F.Supp. at 241, to equate this with the "control" required by American News Co., supra, would reach the absurd result of extending the doctrine to cover every resale of goods. The "indirect purchaser" doctrine, therefore, has no application to this case. If Congress desired to bar a manufacturer from granting functional discounts that might affect its wholesaler's resale policies, further legislation would be required. Under the Act as it stands the manufacturer is free to grant such discounts on an equally available basis to all of its customers, even though the effect may be to limit the development of additional layers of intermediaries which might occur if the discount or allowance were not limited to the performance of a specific type of wholesaler function in the line of distribution.
 
 
 31
 In view of our conclusion that Ford did not engage in price discrimination, it becomes necessary to resolve the other contentions raised by the parties, including whether FLM would have standing to litigate such a claim, whether the incentive plan was injurious to competition, and whether damages were properly proven.
 
 Sherman Act Claims
 
 32
 Turning to the district court's dismissal of FLM's claims based on §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, from which FLM appeals, the § 1 claim appears to mix, rather unclearly, two somewhat different theories: first, that the incentive system was the product of a conspiracy between Ford and its dealers to drive FLM out of business, and second, that even if the incentive system was adopted by Ford on its own initiative it is nonetheless a per se violation of § 1 under the doctrine of United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). FLM's § 2 claim asserts that Ford, having a monopoly over the manufacture of Ford crash parts, was attempting to extend that monopoly to the wholesale market. Judge Griesa found that FLM had not proved the existence of any conspiracy between Ford and its dealers (or between Ford Motor Co. and its wholly-owned subsidiary, Ford Marketing Corp.), and that since FLM had failed to establish that Ford was vertically integrated into the wholesale market for Ford crash parts no basis existed for charging that it had extended its monopoly power at the manufacturing level into that market in violation of § 2.
 
 
 33
 Since the question of whether the incentive allowance plan and its 1971 amendment to FLM's disadvantage was the product of a conspiracy between Ford and its dealers to drive FLM out of business or to fix the prices of parts sold to it is essentially one of fact, see Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc., 539 F.2d 907, 911 (2d Cir. 1976), Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 (2d Cir. 1976), the scope of our review of the trial judge's finding on this issue is limited, Fed.R.Civ.P. 52(a). Faced with a record containing conflicting proof, we cannot say that the trial judge clearly erred in finding that FLM had failed to prove a conspiracy between Ford and its dealers to eliminate FLM or to fix resale prices to it.[12] There was evidence, to which we have alluded, that Ford changed the incentive plan on its own initiative in order to avoid abuses of the system which would undercut its effectiveness in giving independent auto repair shops a chance to compete with Ford dealers. Moreover, FLM concedes that, after the change in the incentive plan, Ford dealers continued to do business with it, albeit on less favorable terms, which tends to undercut the possibility of such a conspiracy.
 
 
 34
 We also agree with Judge Griesa, for the reasons he stated, see 406 F.Supp. at 245, that FLM did not prove a conspiracy between Ford Motor Co., and its subsidiary; we can only regard as frivolous FLM's argument that Ford is estopped from denying such a conspiracy existed by virtue of certain comments in the charge in Rea v. Ford Motor Co., 355 F.Supp. 842, 864 (W.D.Pa.1973), rev'd on other grounds, 497 F.2d 577 (3d Cir.), cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974).
 
 
 35
 Nor do we read the Supreme Court's decision in United States v. Arnold, Schwinn & Co., supra, as providing a basis for holding Ford's pricing system per se illegal under § 1 of the Sherman Act on the ground that it enables Ford, after parting with title to the crash parts, to fix the prices at which dealers will resell the parts to FLM or to stop them from dealing with FLM. Schwinn did not do away with an essential element of § 1 which was here found lacking "a contract, combination or conspiracy," between Ford and its dealers. There the existence of such an agreement was undisputed, and the Court was careful to note that an "explicit agreement or . . . silent combination or understanding" restricting the persons to whom the goods might be resold was an essential condition of a per se violation. 388 U.S. at 382, 87 S.Ct. at 1867; cf. Carter-Wallace, Inc. v. United States, 449 F.2d 1374, 1380-81, 196 Ct.Cl. 35 (1971); Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co., 513 F.2d 102, 108-9 (2d Cir. 1975). Here no such understanding existed. Ford unilaterally established its prices to its dealers and did not fix their resale prices or terms. Although the dealers would be most unlikely as a practical matter to resell below cost, they were free to, and some did, resell to FLM at prices close to their cost. To hold that Ford's establishment of a discount level based on the wholesaler's function in reselling a Ford product violates § 1 of the Sherman Act because of its effect on the wholesaler's resale practices would not only ignore the language of § 1 but in effect require that all functional discounts be outlawed. We do not find any support for such a holding in § 1 or elsewhere.
 
 
 36
 FLM's § 2 claim also suffers from a failure of proof. Where the defendant is charged with monopolization, its possession of monopoly power in the relevant market must be demonstrated, e. g., United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Aluminum Co. of America, 148 F.2d 416, 422-32 (2d Cir. 1945), which requires proof of the approximate share of that market controlled by the defendant. See Note, Attempt to Monopolize Under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case, 73 Colum.L.Rev. 1451, 1459 (1973). Where the defendant is charged with an attempt to monopolize, a " dangerous probability" of success must be shown. E. g., Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); Kreager v. General Electric Co., 497 F.2d 468, 471 (2d Cir.), cert. denied,419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974). But see Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).
 
 
 37
 Here the only relevant market which FLM attempted to define was the wholesale market in Ford crash parts. However, FLM failed completely to prove that Ford, as distinguished from its dealers, had any significant share of that market, much less that it was using its monopoly at the manufacturing level to extend such a share. Cases such as Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1972), where the manufacturer sought illegally to use its power as a manufacturer to extend its proven share of the retail market are therefore inapposite and lend no support to FLM's claim. FLM's alternate theory of its § 2 claim that Ford was conspiring with its dealers to help them maintain their shared monopoly of the market amounts to nothing more than its § 1 claim under another name, and its proof on the point is no more impressive when viewed under the rubric of § 2.
 
 
 38
 For the foregoing reasons, we reverse the judgment entered on the Robinson-Patman Act claim, and affirm the dismissal of the Sherman Act claims.
 
 
 
 [1]
 Until 1968 the price was 58% of the suggested list price; in 1968 this was changed to 60%. We use the 60% figure throughout for ease in computing the examples given
 
 
 [2]
 The parties dispute the part the FTC played in the development of the incentive plan, with Ford suggesting that the FTC played a major role in the adoption of the plan, and FLM arguing that the FTC accepted the plan only reluctantly. As might be expected, the record seems to indicate that the truth falls somewhere in between; it appears that the plan was Ford's idea, but the FTC found it acceptable
 
 
 [3]
 The incentive payment was increased to 25% in 1970
 
 
 [4]
 Another aspect of the evidence is the fact that in 1971 Ford withdrew a special dealer code number which it had issued to Central, and which FLM used for direct billing on parts it purchased. We mention this only for the sake of completeness, since it is peripheral to the issues raised on this appeal
 
 
 [5]
 On the remand, the Court of Appeals set aside the FTC's cease and desist order against Borden on various grounds, including that the private brand milk had been sold to any customer who asked for it. See Borden Co. v. FTC, 381 F.2d 175 (5th Cir. 1967)
 
 
 [6]
 Perkins v. Standard Oil Co. of California, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), does not cast any doubt on this conclusion. In that case, it was established that the seller had discriminated in price against some of its purchasers; the only question was level of distribution at which the requisite competitive injury could be shown
 
 
 [7]
 While we do not adopt a narrow construction of the Robinson-Patman Act in this case, it should be noted that such a mode of construction of the Act has frequently been advocated. See, e. g., FTC v. Fred Meyer, Inc., supra, 390 U.S. at 359-60, 88 S.Ct. 904 (Harlan, J., dissenting); Friendly, The Gap in Lawmaking Judges Who Can't and Legislators Who Won't, 63 Colum. L.Rev. 787, 794 (1963)
 
 
 [8]
 The incentive payments here under attack were not related to any advertising or promotional activities by the Ford dealers who resold the crash parts to independent repair shops; they were merely adjustments to price, and as such, not within the ambit of the stricter prohibitions imposed by § 2(d). See Rutledge v. Electric Hose & Rubber Co., 511 F.2d 668, 678 (9th Cir. 1975); Kirby v. P. R. Mallory & Co., 489 F.2d 904 (7th Cir. 1973), cert. denied, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974). It is true that in some instances the word "customer" in § 2(d) and the word "purchaser" in § 2(a), are to be given the same meaning, see, e. g., American News Co. v. F.T.C., 300 F.2d at 109, but the Supreme Court limited its holding in Fred Meyer, Inc. (that a manufacturer was required to give the same promotional allowances to retailers purchasing from wholesalers as to retailers buying directly from him) to § 2(d) cases. See 390 U.S. at 348-52, 88 S.Ct. 904
 
 
 [9]
 While a limited amount of evidence was presented dealing with these other incentive plans, their structure appears to be essentially the same as that of the crash parts plan
 
 
 [10]
 We cannot fathom the trial judge's contrary conclusion that FLM was not even "potentially" such an intermediary between Ford dealers. We see no evidence of any aspect of FLM's operations which would assure against such dealings
 
 
 [11]
 The only direct dealings appear to be Ford's delivery of parts directly to FLM when the latter was buying them through Central and using a dealer number assigned to Central, and the audits of FLM, to which it consented
 
 
 [12]
 The record discloses nothing even vaguely resembling the course of conduct, including extensive policing efforts and threats of physical violence to dealers, which led the Supreme Court to conclude that a "classic conspiracy in restraint of trade" had been shown in United States v. General Motors Corp., 384 U.S 127, 140, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), on which FLM relies