UNITED MAGAZINES COMPANY,
et al., Plaintiffs,

v.

MURDOCH MAGAZINES
DISTRIBUTION, INC.,
et al., Defendants.

No. 00 Civ.3367 PKC.

United States District Court,
S.D. New York.

Dec. 29, 2004.

Carl E. Person, New York City, for plaintiffs.

Philip G. Barber, Yang Chen, Constantine & Partners, P.C., New York City, for Murdoch Magazines Distribution, Inc., defendant.

Edward Jeremy Reich, Sonnenschein Nath & Rosenthal, New York City, Steven Karl Barentzen, Dla Piper Rudnick Gray Cary Us, LLP, Washington, DC, for Chas. Levy Circulating Co.

Yang Chen, Constantine & Partners, P.C., New York City, for TV Guide Distribution, Inc.,

Daniel C. Malone, Paul H. Friedman, Terry L. Bowman, Thomas F. Munno, Dechert Price & Rhoads, New York City, George G. Gordon, Samuel E. Klain, Dechert, LLP, Palo Alto, CA, for Curtis Circulation Co.

Lawrence I. Fox, McDermott, Will & Emery, New York City, for Comag Marketing Group, LLC, Hearst Distribution Group, Inc., defendants.

Michael I. Bayda, Jacobs, Persinger & Parker, New York City, for Kable News Co., Inc.

Irving Scher, Weil, Gotshal & Manges, New York City, for Time Distribution Services, Inc. Warner Publisher Services, Inc.

Carl E. Person, New York City, for United Magazine Co., Inc., Stoll Companies, Michiana News Service, Inc., Geo R. Klein News Co., Scherer Companies.

### MEMORANDUM AND ORDER

CASTEL, District Judge.

Plaintiffs United Magazine Company, The Stoll Companies, Michiana News Service, Inc., Geo. R. Klein News Co. and Central News Company (collectively, "Plaintiffs" or "Unimag") are wholesalers of magazines. The magazines at issue are "distributed" by defendants Murdoch Magazines Distribution, Inc. ("Murdoch Distribution"), TV Guide Distribution, Inc. ("TGD"), Curtis Circulation Company ("Curtis"), Comag Marketing Group, LLC ("Comag"), Hearst Distribution Group, Inc. ("HDG"), Time Distribution Services, Inc. ("TDS") and Warner Publisher Services, Inc. ("WPS") (collectively, "defendants" or "national distributors").[1] Plaintiffs allege that, from May 1996 through May 2000, defendants violated the Robinson–Patman Act, 15 U.S.C. § 13(a), by providing "secret discounts, rebates, other payments, services of value and other benefits" to certain competitors of plaintiffs. Defendants have asserted counterclaims seeking tens of millions of dollars in accounts receivable owed by plaintiffs on unpaid bills. Pointedly, plaintiffs have sued the national distributors who hold these large accounts receivable but have refrained from filing suit against publishers.

Defendants have moved for summary judgment arguing that the publishers and not the national distributors set the allegedly discriminatory prices and terms of sale. To frame the issues, it is necessary to provide a brief overview of the magazine distribution system.

Magazine publishers create the editorial content that is printed in magazines. Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a) ("56.1") ¶ 3. Although the parties dispute the precise mechanism by which magazines arrive in the hands of wholesalers such as the plaintiffs, magazine publishers generally deliver the manuscripts to printers, who print copies of the magazines and then arrange for independent carriers to pick up the magazines and de-

---

**1.** Kable News Company, Inc. is also a defendant, but has not joined the present motion for summary judgment. For purposes of this motion and as used herein, "defendants" is defined to exclude Kable News Company.

liver them to wholesalers, direct accounts or "breakup agents." 56.1 ¶¶ 4–5; Plaintiffs' Statement of Disputed Material Facts Pursuant to Local Civil Rule 56.1(b) ("Pls.56.1") ¶¶ 4–5. In some circumstances, the national distributors provide the publishers with lists of the wholesalers and the number of copies to be delivered to each. *Id.* (and exhibits cited therein). The wholesalers receive the magazines from the independent carriers and resell the magazines to retail outlets. Retailers, such as newsstands and supermarkets, sell the magazines to consumers. 56.1 ¶ 8.

The role of the "national distributors," such as defendants, is central to this litigation. According to defendants, the term "distributor" is a misnomer, because, they argue, the national distributors never receive physical possession or title to the magazines. Rather, they assert that the national distributors are engaged by the publishers to: (1) oversee the distribution process; (2) monitor the display and sales of magazines at the retail level; and (3) serve as billing and collection agent for the publishers, which entails billing the wholesalers for magazines and collecting and remitting their payments back to the publishers. Plaintiffs assert that, at least in some instances, the national distributors do obtain title. However, in their Form 10–K filed with the SEC for fiscal year 1998, plaintiff United Magazine described the role of the national distributors in terms consistent with defendants' position on their motions: "the national distributors do not physically touch the product. Instead, they function as brokers of information and collectors of funds from the wholesale distributor for remittance to the publishers." Affidavit of August T. Horvath in Support of Defs. Reply Mem. of Law ("Horvath Reply Aff't") Exh. 3 at UMO99973.

Magazines that remain unsold at the end of their shelf lives are removed from retail locations by the wholesalers, at the wholesalers' expense. The wholesalers are then responsible for discarding the unsold publications and certifying the disposal to the national distributors. Second Amended Complaint ¶¶ 47–50; Transcript of Oct. 21, 2004 Oral Argument ("Oral Argument Tr.") 23–25; Declaration of Eugene Alfonsi ("Alfonsi Decl.") Exhs. B–D. Although certification may entail removing the cover of each unsold publication and providing the covers to the relevant distributor, the more common practice is to provide the distributor with an affidavit stating that the wholesaler properly disposed of the particular publication. Second Amended Complaint ¶ 49; Oral Argument Tr. 21. The defendants set the policies that dictate the contents of the return affidavits and the record-keeping required by the wholesalers in order to receive credit for unsold publications. *Id.;* Oral Argument Tr. 24–25. The unsold publications then generate credits back up the chain of sale: retailers receive credits from wholesalers for each unsold publication, the wholesalers in turn receive credits from the national distributors, and the national distributors receive credits from the publishers. Second Amended Complaint ¶¶ 50, 52; Oral Argument Tr. 24; WPS Answer to Second Amended Complaint ¶¶ 50, 52.

According to the national distributors, they are paid a commission by the publishers for the services they render. 56.1 ¶ 6. Wholesalers make their gross profit by purchasing the magazines at a discount off the cover price. Defendants contend that the publishers had sole control over setting both the retail cover prices of the magazine titles published by each and the price charged to the wholesalers, *i.e.,* the cover price less the wholesalers' discount, which was then billed to wholesalers by the national distributors.

Plaintiffs appear to concede that the publishers set the cover prices for magazines, but contend that they believed they were purchasing the magazines for re-sale from the distributor defendants, and that, in at least some instances, the national distributors could set or alter the discount off cover price offered to plaintiffs. Plaintiffs' contention that the national distributors "purchase the magazines from their respective publishers for resale to Plaintiffs . . . ," Pls. 56.1 ¶ 6, is not supported by the evidence submitted by either side on defendants' motion. Plaintiffs rely on portions of contracts that include language providing that the various distributors were to bill and collect payments from distributors for their own account, or that otherwise describe how the distributors were to assume the credit risk in the distribution process. *See* Exhibits cited in Pls. 56.1 ¶ 6. As noted below, that the national distributors assumed the credit risk of non-payment by the wholesalers is not disputed, but that does not create a genuine issue of material fact as to determination and control of the prices charged to plaintiffs.

Finally, plaintiffs contend that the national distributors were responsible for the returns policies, a fact that defendants concede, and that these policies were applied in such a way as to make the actual cost per copy for magazines higher for the plaintiff wholesalers than for their competitors.

*Procedural Background*

Plaintiffs' initial Complaint in this action was filed on May 3, 2000. An Amended Complaint was filed on August 31, 2000. A Second Amended Complaint was filed on June 21, 2001. On December 17, 2001, Judge Schwartz dismissed certain of plaintiffs' claims and denied leave to further replead. The parties were subsequently ordered to confer and submit a discovery plan on or before February 11, 2002. The parties' discovery plan (entered as a Scheduling Order) provided for over a year of fact discovery (ending April 30, 2003), and for all expert discovery to be completed by October 31, 2003. The Scheduling Order noted that "because of the lengthy period of time provided," no further extensions would be given. Nevertheless, on March 7, 2003, plaintiffs were granted a three-month extension of the fact discovery period. On May 7, 2003, the deadline for fact discovery was extended once more, to July 30. On July 21, 2003, fact discovery was extended for limited purposes. On November 25, 2003, the case was reassigned to me. On December 15, 2003, I ordered that all outstanding discovery be completed by December 30, 2003, almost two full years after the start of discovery.

Following this extensive period of discovery, defendants sought to dismiss the majority of plaintiffs' remaining claims by motions for summary judgment. At a pre-motion conference held on February 11, 2004, defendants tendered several grounds on which they believed they were entitled to summary judgment in this case. One proposed basis was that the distributor defendants did not sell any magazines to plaintiffs, did not set the prices charged to the plaintiff wholesalers and, therefore, could not be liable under section 2(a). At that conference, the Court inquired of plaintiffs' counsel as to the evidence they would submit concerning "who, in fact, sets the price as opposed to your client's expectations or understandings or thoughts as to who set the price." Transcript of February 11, 2004 Conference at 10–11. Counsel for plaintiffs responded that "we don't really know that the National Distributor doesn't tell the publisher what it wants and the publisher ratifies it. I don't know what the relationship is between the

two of them and how they allocate their function." *Id.* at 11. The Court permitted defendants to proceed at that time with motions directed solely to the issue of whether section 2(a) of the Robinson–Patman Act applies to the transactions at issue in this case (see Defs. Letter of Feb. 6, 2004 at 3), reserving their right to move on other grounds at a later date if necessary.

Defendants now move for summary judgment on plaintiffs' section 2(a) claim, on the basis that defendants "do not sell magazines to the plaintiffs, and, accordingly, the plaintiffs do not purchase magazines from the moving defendants." Defs. Mem. at 2. Defendants assert that they are entitled to summary judgment on two alternate grounds. First, they argue that section 2(a) requires a transaction between a seller and a purchaser, and because defendants do not sell magazines to the plaintiffs, section 2(a) does not apply to them. In support of this argument, defendants rely on a test first articulated in *Loren Specialty Manufacturing Co. v. Clark Manufacturing Co.*, 241 F.Supp. 493 (N.D.Ill.1965), *aff'd*, 360 F.2d 913 (7th Cir.), *cert. denied*, 385 U.S. 957, 87 S.Ct. 392, 17 L.Ed.2d 303 (1966), which looked to such factors as whether the product was shipped directly from the defendant to the customer, who bore the risk of loss in transit, who bore the credit risk, and whether the defendant ever took possession or formal title of the discriminatorily-priced products. Alternatively, defendants argue that they are entitled to summary judgment based on the "indirect purchaser" doctrine or theory as articulated in

American News Co. v. Federal Trade Commission, 300 F.2d 104, 109 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962).[2]

Defendant TDS seeks summary judgment at this time only with respect to magazines published by companies other than its parent company, Time Inc. By the terms of its contract with Time Inc., TDS is the purchaser and reseller of those titles published by Time Inc. At least some of the national distributors are indirect subsidiaries of a publisher whose magazines they distribute (*see, e.g.*, Jacobsen Aff't ¶ 4; Local Rule 1.9 Statement of Comag and HDG). Each, however, also distributes magazines of non-affiliated publishers, and plaintiffs have proffered no argument in opposition to this motion that any national distributor should be held liable under section 2(a) based on its corporate relationship with any publisher. I heard oral argument on defendants' motions October 21, 2004.

For the reasons set forth below, I conclude that all moving defendants other than Curtis are entitled to partial summary judgment. Defendants have demonstrated that they lack control of the price and other terms of sale to plaintiffs, and plaintiffs have not succeeded in creating a genuine issue of material fact with respect thereto. As to any claim based on defendants' return policies, I conclude that defendants, who concede that they are responsible for the allegedly discriminatory return policies, have not met their initial burden of demonstrating that their return policies cannot support a price discrimina-

---

**2.** The "indirect purchaser" theory relied upon by defendants is not to be confused with the "indirect purchaser" theory of standing applied in Sherman Act claims and articulated in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Under *Illinois Brick*, a purchaser cannot maintain a

Sherman Act claim against an indirect seller unless the indirect seller is a conspirator in the direct seller's Sherman Act violation. Neither party has cited any case applying such a "co-conspirator" theory to liability under the Robinson–Patman Act.

tion claim against them under section 2(a). While defendants' position was not fully developed on these motions, they may be able to demonstrate that plaintiffs are precluded from asserting any claim based on return policies, because, in the course of the litigation, plaintiffs gave up their right to assert such a claim (Oral Argument Tr. at 60–61), or because such a claim would not fall within section 2(a).[3] Of course, at trial, plaintiffs would be required to demonstrate that defendants' return policies affect the price paid for magazines, that the policies in fact result in discriminatory prices, and that any such discriminatory pricing is chargeable to defendants and not to the publishers. At this juncture, however, defendants have not adequately demonstrated that they are entitled to summary judgment with respect to return policies.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation and quotation marks omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving

---

**3.** Cases that have addressed potential Robinson–Patman liability based on discriminatory returns for credit have often found that such claims are properly addressed under section 2(e), and not section 2(a), or have addressed them under section 2(e) without discussion. *See, e.g., Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319 (6th Cir.1983); *Joseph A. Kaplan & Sons, Inc. v. FTC,* 347 F.2d 785, 787–88 (D.C.Cir.1965); *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 502 F.Supp. 637, 649 (D.N.J. 1980). Many of these decisions, however, relied on an FTC regulation, 16 C.F.R. § 240.7, which explicitly listed "returns for credit" as a "service[ ] or facility" subject to section 2(e). That regulation has since been revised, and the reference to "returns for credit" deleted. The final ruling implementing the revised regulation makes clear that the issue of whether an allegedly discriminatory return policy properly is analyzed under section 2(a) or section 2(e) is an open one. *See* 55 Fed.Reg. 33651–01, at p. 8, available at 1990 WL 355392, at *33654 (Aug. 17, 1990) (emphasizing that a close connection to resale is required for a section 2(e) claim, and noting that "[r]eturns for credit are not sufficiently connected to resale to justify their inclusion as a representative example" and that "section 2(a) may well apply to their discriminatory provision").

party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, in order to survive summary judgment, plaintiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505. In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

## II. PLAINTIFFS' SECTION 2 CLAIM

Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), makes it unlawful for "any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either

grants or knowingly receives the benefit of such discrimination, or with customers of either of them." [4]

*Control of the Price or Terms of Sale is Required Under Section 2(a)*

■ Defendants argue that in order to maintain their section 2(a) claim, plaintiffs must establish that they are " 'an actual purchaser from the person charged with the discrimination.' " Defs. Mem. at 14 (quoting *Baim & Blank v. Philco Corp.*, 148 F.Supp. 541, 543 (E.D.N.Y.1957) (citing *Klein v. Lionel Corp.*, 237 F.2d 13 (3d Cir.1956))). Nothing in the text of section 2(a) dictates such a result. Section 2(a) is not expressly limited to sellers. It prohibits "any person" from discriminating, directly or indirectly, "in price between different purchasers of commodities." In the normal course of dealing, it is only "the person charged with the discrimination" who, by making a sale, will be capable of offering a discriminatory price to "an actual purchaser." As a result, cases often speak of liability of the "seller," although the term does not appear in section 2(a). *See, e.g., George Haug Co.*, 148 F.3d at 141; *American News*, 300 F.2d at 109 (the Act "forbid[s] *sellers* to make direct or indirect discriminations in price between one purchaser or customer and another") (emphasis added); *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir.1987) ("[T]he act prohibits *a seller* from engaging in price discrimination that is likely to result in competitive injury.") (emphasis added). It is possible

---

**4.** "Price discrimination claims generally fall into three categories. The first, primary line price discrimination, occurs when a seller's price discrimination harms competition with the seller's competitors. The second, secondary-line price discrimination, occurs when a seller's discrimination impacts competition among the seller's customers, *i.e.*, the favored purchasers and disfavored purchasers. The third, tertiary-line violation, occurs when the

seller's price discrimination harms competition between customers of the favored and disfavored purchases, even though the favored and disfavored purchasers do not compete directly against each other." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141 n. 2 (2d Cir.1998) (internal citations omitted). This case raises a claim of secondary-line price discrimination.

to imagine, at least in theory, a situation in which the person responsible for the discriminatory pricing is someone other than the person from whom plaintiff has purchased the goods in question.

I do not read *Baim & Blank* to be to the contrary; there, in determining liability the Court looked to who had the power to set the complained-of prices. *See Baim & Blank,* 148 F.Supp. at 543–44. Indeed, *Baim & Blank* appears to anticipate the indirect purchaser rule later articulated by the Second Circuit in *American News:* that as long as a person (deemed the "seller" in *American News* ) "exercises control over the terms of a transaction," he is held to a duty not to discriminate, so that an aggrieved purchaser may bring a claim under the Robinson–Patman Act even against someone from whom he did not actually purchase, if that person is responsible for the discriminatory price. *American News,* 300 F.2d at 109–110 (citing *Baim & Blank* for the proposition that "[i]f there is no control the duty naturally ends, for the manufacturer has no power to protect the buyer's competitors"). The indirect purchaser doctrine was applied offensively in *American News,* enabling the FTC to reach the conduct of the party ultimately responsible for the discriminatory terms, *i.e.,* the magazine publisher.[5] Although the Third Circuit in *Klein* appears to have applied a rule that a plaintiff

must have actually "purchased" "from the person charged with the discrimination," 237 F.2d at 15, the Second Circuit rejected precisely this rule in *American News.* 300 F.2d at 109 n. 6 (distinguishing *Klein* ).[6]

The proper inquiry is who controls the price or terms of sale that the plaintiff alleges are discriminatory. Without such control, a person cannot be said to "discriminate in price" as required for liability under section 2(a). *See American News Co.,* 300 F.2d at 109 (looking to who "controls the terms upon which [the purchaser] buys."). *See also Lewis v. Philip Morris Inc.,* 355 F.3d 515, 528 (6th Cir.) ("Absent any indication in the record that Philip Morris 'actually controlled' the terms of sale by wholesalers to vendors, [we must] affirm the district court's summary judgment regarding section 2(a) claims brought by vendors who purchase through wholesalers."), *cert. denied,* —— U.S. ——, 125 S.Ct. 61, 160 L.Ed.2d 31 (2004); *cf. Purolator Products, Inc. v. FTC,* 352 F.2d 874, 883 (7th Cir.1965) ("If the seller controls the sale, he is responsible for the discrimination in the sale price, if there is such discrimination. If the seller cannot in some manner control the sale between his immediate buyer and a buyer once removed, then he has no power by his own action to prevent an injury to competi-

---

**5.** As the Sixth Circuit has noted, "[t]he purpose of the indirect doctrine is to prevent a manufacturer from insulating itself from Robinson–Patman liability by using a 'dummy' wholesaler to make sales at terms actually controlled by the manufacturer." *Barnosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74, 84 (6th Cir.1981) (citing *American News,* 300 F.2d at 109–10).

**6.** The *American News* court describes *Klein* as a case in which the plaintiff "did not show that Lionel controlled the terms set by the wholesaler." 300 F.2d at 109 n. 6. It is not clear to this Court whether the manufacturer

or the wholesaler in *Klein* set the prices charged to the retailer in that case. The case indicates that the manufacturer set the minimum resale price. 237 F.2d at 15. Although this suggests that the wholesaler would otherwise set the price charged to retailers, it is not stated directly. Of course, if it is true that in *Klein,* the manufacturer did not control the actual price charged to the retailer, then the case is in line with authority that ultimately looks at control of pricing or terms of sale, and not to whether a plaintiff actually purchased from the person charged with discrimination.

tion."), *cert. denied,* 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968).

*Ohio Agency Law Does Not Control*

■ In opposing defendants' motion, plaintiffs rely on Ohio state agency law in an apparent attempt to establish that if defendants did not disclose that they were merely an agent of publishers, and did not identify the publishers, then the defendants, as agents, are "liable for the contracts entered into." Pls. Mem. at 3. Plaintiffs' argument fails both legally and factually.

■ Plaintiffs have provided no authority holding that liability under the Robinson–Patman Act may be premised upon an "undisclosed principal" theory. This is not an action for breach of contract under Ohio law. It is an action for treble damages under the federal antitrust laws. It is generally acknowledged that "treble-damage actions under the antitrust laws are analogous to common-law actions sounding in tort." *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 634, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). Under principals of tort law, an agent is not liable for its principal's tortuous conduct, even if the principal is undisclosed. *See Washington v. B.E.I. Real Estate,* 1992 WL 19320, at *3 (Ohio Ct.App. Feb.5, 1992) (Grady, J. Concurring) ("To hold otherwise ... creates a theory of 'respondeat inferior',

which is not recognized in the law."); *cf. Coleman v. Houston Independent School District,* 113 F.3d 528, 534–35 (5th Cir. 1997) (finding that district court erred in endorsing a theory of "respondeat inferior liability" and that employer's discriminatory intent could not be imputed to employee); *Flaherty v. Baybank Merrimack Valley, N.A.,* 808 F.Supp. 55, 61 (D.Mass.1992) (granting summary judgment "because plaintiffs have offered no legal support for their 'respondeat inferior' theory that the attorney agents are somehow vicariously liable for the tortuous acts of their principals").

Factually, plaintiffs assert that they did not know the identity of the publishers of the magazines that they were purchasing (Pls. Mem. at 5, citing Alfonsi Declaration ¶ 3), or did not understand the role the distributors played vis à vis the publishers. For the purposes of this motion, I fully credit plaintiffs' astonishing assertion that, despite the ready availability of a magazine's masthead, they did not know the identity of the publishers of the magazines handled by the defendants.[7] I further accept that they thought the national distributors, and not the publishers, were setting prices. Even so, plaintiffs have cited no authority supporting the proposition that their subjective belief that the defendant distributors were responsible for pricing

---

7.  Plaintiffs' assertion is not directly supported by the Alfonsi Declaration, which states that United Magazine believed that the defendants were selling on their own behalf, or were acting as agents of the publishers, and that invoices did not identify the publishers, but does not state that Mr. Alfonsi or United Magazine did not know the identity of the publishers. *See* Alfonsi Decl. ¶ 3. Indeed, the evidence presented suggests that plaintiffs did know or could have known the identity of the publishers. *See, e.g.,* May 8, 2003 Deposition of Eugene Alfonsi (Horvath Aff't Exh. 1) at 258 ("I believe the national distributors act as an agent representing publishers."); July 29,

2003 Deposition of Pls. 30(b)(6) Witness Ronald Scherer (Horvath Aff't Exh. 16) at 39; Horvath Reply Aff't Exhs. 3 (acknowledging that the national distributors "function as brokers of information and collectors of funds from the wholesale distributor for remittance to the publishers"), 16 (list of magazine titles and publishers), 17 & 18. To the extent that the Alfonsi Declaration contradicts Mr. Alfonsi's deposition testimony in the case, it would not be sufficient to create a genuine issue of material fact on this issue. *See, e.g., Rubens v. Mason,* 387 F.3d 183, 192 (2d Cir.2004). As noted, I accept plaintiffs' assertion *arguendo.*

and were "selling" magazines to plaintiffs is sufficient to hold defendants liable under section 2(a).

## III. THE FACTUAL RECORD ON THE SUMMARY JUDGMENT MOTIONS

■ In support of their motions, each defendant submitted evidence that the publisher or publishers whose titles it handled set prices and controlled the terms of sale to the plaintiffs and that it had no role in the process. Each moving defendant submitted affidavits or declarations from people with knowledge of the relationship between publishers, national distributors and wholesalers, describing the terms of the contracts and the course of dealing between the parties. Defendants' individual showings (set forth below) are bolstered by a Declaration from Tom Doddy, purchasing director of plaintiff United Magazine during the applicable time period.[8] Horvath Aff't Exh. 21. In his Declaration, Mr. Doddy states that he "always understood that the publishers were responsible for determining all aspects of the prices paid by Unimag for magazines, including the cover prices of the magazines and any discounts, allowances, promotional programs or incentive programs ... It was always my understanding that the dis-

count off cover, and any deviation from it, was determined by the magazine publishers, not the national distributors. The same was true for any other form of allowance, discount, incentive program or promotional program." Declaration of Thomas R. Doddy (Horvath Aff't Exh. 21) ¶ 5. Defendants' showings are further supported by the testimony of Carol Kloster, CEO of Chas. Levy Circulation Co., a wholesaler and competitor of plaintiffs. Ms. Kloster testified that she understood that it was the publishers who controlled the prices charged to wholesalers. See August 15, 2003 Deposition of Carol Kloster (Horvath Aff't Exh. 11) at 203–06.

The evidence put forward by defendants establishes that the publishers, and not the defendants, determined the prices and discounts at which magazines would be sold to the plaintiff wholesalers. The facts set forth in the affidavits were supported by ample citations to admissible evidence in the form of documents and deposition testimony, including deposition testimony from officers and employees of plaintiffs. They are sufficient to meet each defendant's initial burden of demonstrating that it had no role in setting prices and terms of sale (except for return policies) charged to plaintiffs. It becomes plaintiffs' burden to demonstrate, through admissible evi-

---

8. Plaintiffs move to strike the Doddy Declaration on the ground that Mr. Doddy was not disclosed as a person likely to have discoverable information that a defendant may use to support its defenses, Rule 26(a), and was not included as a trial witness in the defendants' post-discovery submissions to this Court. The identity of Mr. Doddy, a former employee of plaintiffs, was not only known to plaintiffs, but he was listed by at least one defendant—Curtis—in its Rule 26(a) initial disclosure on February 19, 2002. Notwithstanding the disclosure—and Doddy's name on numerous documents produced by plaintiffs in this litigation—plaintiffs chose not to take his deposition during the ample discovery phase of this case. Plaintiffs' decision not to take Mr. Dod-

dy's deposition does not preclude defendants from relying on his affidavit on summary judgment, nor does it entitle plaintiffs to reopen discovery. Denying a motion for summary judgment on the basis of Rule 56(f) is not appropriate where, as here, plaintiffs have "had a fully adequate opportunity for discovery." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989). Plaintiffs' argument that the Doddy Declaration is without foundation is similarly unavailing. The Declaration itself recites Mr. Doddy's background and role at Unimag during the relevant time period in some detail, and this provides a foundation for the statements contained therein.

dence, that there is at least one genuinely disputed issue of material fact for trial.

In their opposition papers, plaintiffs characterize the relationship between themselves and the national distributors as one in which the national distributors purchased magazines from the publishers and resold them to the plaintiffs. But characterization and conclusory description, no matter how often repeated, do not alone create a triable issue of fact. *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (opposing party may not create a genuine issue of fact "merely by the presentation of assertions that are conclusory"); *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported by the record. Where ... the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."). The extended discovery period in this case, exceeding two years, gave plaintiffs a more than ample opportunity to uncover evidence that defendants participated in setting prices and terms of sales. Plaintiffs have failed to do so, save for Curtis and the return policies discussed below.

Plaintiffs also attempt to create a genuine issue of material fact by pointing to evidence specific to each individual distributor. Because the evidence adduced in opposition to summary judgment varies for each of the moving defendants, I will consider each defendant in turn. This will first entail setting forth the evidence that the particular defendant proffered as part of its initial summary judgment burden and then the evidence upon which plaintiffs rely in an effort to create a genuine issue of fact.

### 1. *Murdoch Magazines Distribution, Inc. and TV Guide Distribution, Inc.*

Defendants Murdoch Distribution and TGD offered Declarations from Klaus Gunn ("Gunn Decl." and "Gunn Reply Decl."), who held a variety of positions at Murdoch Distribution during the relevant time period, including Vice President of Publisher Operations.[9] In his various roles, Mr. Gunn was responsible for managing the distribution for all publishers other than TV Guide Magazine Group. Gunn Decl. ¶¶ 3–4. Mr. Gunn attests that "[d]uring the time period when Murdoch was a national distributor for publishers, all prices, discounts, rebates, incentive plans, promotional programs, on-sale and off-sale dates and number of copies and allocations were set by the publishers." Gunn Decl. ¶ 14. Representative copies of contracts between Murdoch Distribution and the publishers it represented are annexed to the Gunn Affidavit and support Mr. Gunn's statements. The Gunn Affidavit establishes that the publishers, not Murdoch Distribution, were responsible for the cover prices and the wholesalers' prices (calculated as a discount off of the cover price), and that Murdoch Distribution did not sell magazines to plaintiffs, but rather, largely served "a billing and collections function for publishers." *See* Gunn Decl. ¶ 5 ("[P]ublishers also set the cover prices and determine the off-cover discounts for the magazines for wholesalers."); ¶ 11 ("Publishers ... sold and delivered the magazines directly to the wholesalers."); ¶ 12 ("Murdoch did not set

---

9. Murdoch Distribution changed its name to TV Guide Distribution, Inc. ("TGD") in January 1999. Gunn Aff't ¶¶ 3, 7. The evidence submitted as to Murdoch Distribution and TGD will therefore be discussed together for purposes of this motion. TGD ceased distribution in May 2000. *Id.* ¶ 7.

prices and did not determine the discount off cover price."); ¶ 13 ("Murdoch did not sell magazines to the wholesaler plaintiffs."); Gunn Reply Decl. ¶ 3 ("national distributors like Murdoch perform a billing and collections function for publishers"); ¶ 5 (publisher set prices and discounts); ¶ 7 ("Murdoch had no control over magazine content and never set cover prices or the discount off cover prices.").

In opposition to the showing by Murdoch Distribution, plaintiffs rely on provisions in Murdoch Distribution contracts with various publishers that, *inter alia*, purportedly require Murdoch Distribution to "collect the accounts receivable from them [the wholesalers] for the account of Distributor." *See, e.g.*, Pls. 56.1 ¶ 6 & Exh. A ¶ 664 (quoting from Gunn Decl. Exh. L ¶ 5). Such provisions, however, simply demonstrate that defendants bore the credit risk in their roles as billing and collection agents for the publishers, a point which defendants do not appear to dispute, and does not speak to pricing or otherwise setting or controlling terms of sale.

### 2. *Curtis Circulation Company*

In support of its motion, Curtis submitted a Declaration and Reply Declaration from Robert Castardi ("Castardi Decl." and "Castardi Reply Decl."), President of Curtis since 1992. Castardi Decl. ¶ 1. Putting aside the issue of a returns policy, the Castardi Declaration successfully meets Curtis's initial burden of demonstrating that Curtis did not control the prices charged to wholesalers for magazines carried by Curtis. *See, e.g.*, Castardi Decl. ¶ 8 ("Curtis does not establish either the retail price for magazines or the price that a wholesaler pays for magazines. Any magazine pricing authority resides in the publishers' control ... The publishers also establish the discount off of the cover price that is charged to wholesalers for any magazines. Wholesalers negotiate directly with the publishers for specific discounts. Curtis does not have pricing authority."); ¶ 13 ("Our publisher clients have always retained the sole authority to establish any elements of the price paid by wholesalers."). Mr. Castardi's statements are supported by deposition testimony, including deposition testimony of wholesalers, and citations to representative contracts with publishers. *See, e.g.*, Castardi Decl. note 18.

In opposition to Curtis's motion and the Castardi Declaration, plaintiffs submit evidence that in September 1996 Curtis offered plaintiffs pricing equivalent to a competitor (Levy) only if plaintiffs purchased *all* magazines offered by Curtis. Alfonsi Decl. Exh. A; *see also* Scherer Dep. (Horvath Aff't Exh. 16) at 40 (discounts from Curtis were negotiated for the entire line, not particular publishers).[10] That letter, which states that "Curtis offers a preferred rate to wholesalers providing full-line distribution service in designated markets, distributing substantially all of Cur-

---

**10.** Although not abundantly clear, plaintiffs appear to attempt to make a similar argument with respect to all of the distributor defendants. In a conclusory fashion, Alfonsi Declaration ¶ 13 states that in 1999, "each of the defendants withheld or threatened to withhold" top selling magazines if plaintiffs did not take smaller selling magazines. Unlike the Curtis document annexed as Exhibit A to the Alfonsi Declaration, the statement at paragraph 13 does not expressly reference control over price (as distinguished from control of supply). Judge Schwartz earlier dismissed plaintiffs' full-line forcing claim. May 31, 2001 Opinion and Order at 16–22, 55. Without more, I find that Alfonsi Declaration ¶ 13, which does not mention pricing, is not sufficient to create a genuine issue of material fact as to any other defendants' control over pricing or other terms of sale; even generously read, the conclusory assertion appears to relate to unpled claims of unlawful tying arrangements or refusals to deal and not a Robinson–Patman claim.

tis' [sic] titles to retail customers," creates a genuinely disputed material issue of fact as to whether Curtis had independent pricing control for the titles it carried. Curtis attempts to place the letter in the context of a "chain of correspondence" that supposedly demonstrates both that publishers had ultimate pricing control and that the pricing issues raised in the correspondence were limited to a specific market arguably not covered by plaintiffs' claims in this case. Defs. Reply Mem. at 21–22; Castardi Decl. Tab 106 (letter from plaintiffs inquiring about "price adjustment from publishers through [Curtis]"); Oral Argument Tr. at 47–50. But these arguments would require me to draw inferences in favor of Curtis, the movant, as to the meaning of the chain of correspondence, the contents of specific letters, and the provisions of certain contracts between Curtis and the publishers it represents (*see, e.g.,* Castardi Decl. Exh. A at Attachment A (defining "primary wholesaler") and Oral Argument Tr. at 58–60, 62). Because I must draw all reasonable inferences in favor of the non-movant, I conclude that there is a disputed issue of material fact that must be resolved by a jury. Because I conclude that the 1996 letter and surrounding circumstances create a triable issue of fact as to defendant Curtis, I need not address plaintiffs' other arguments as to Curtis.[11]

### 3. *Comag Marketing Group, LLC and HDG/Hearst*

Comag and HDG submitted affidavits from Mark F. Miller ("Miller Aff't"), Executive Vice President and General Manager of the Hearst Magazine Division of Hearst Communications ("Hearst Magazines") since 1985, and from John E. DiFrisco ("DiFrisco Aff't" and "DiFrisco Reply Aff't"), Assistant Vice President of Finance and Accounting for Comag since April 2000.[12] Mr. Miller was responsible, on behalf of the publisher Hearst Magazines, for negotiating and executing agreements between Hearst Magazines and HDG. Miller Aff't ¶ 2. From January 1998 to March 2000, Mr. DiFrisco served as Director of Business Affairs and Assistant Vice President of Finance and Accounting for HDG. DiFrisco Aff't ¶ 2. In his positions at Comag and HDG, Mr. DiFrisco was responsible, on behalf of the distributors Comag and/or HDG, for interfacing with publishers and wholesalers with respect to pricing. *Id.* Both Mr. Miller and Mr. DiFrisco attest that the publishers, and not HDG, were responsible for the prices paid by wholesalers for the magazines. Miller Aff't ¶ 5 ("Hearst Magazine alone determined the cover prices for each of its publications."); ¶ 6 (Hearst Magazines also determined "all prices and discounts, in-

---

11. Plaintiffs seek to strike certain of the contracts relied upon by Curtis on the ground that they were not produced in discovery. The evidence submitted in opposition to plaintiffs' motion to strike makes clear, however, that Curtis made it known to plaintiffs in this litigation that they were producing only representative contracts, and not all contracts. Plaintiffs never sought to have them produce additional or all contracts. The Castardi Declaration further makes clear that the produced contracts are in fact representative of all contracts, produced or not produced. Castardi Decl. ¶ 3. Plaintiffs' motion to strike is denied.

12. The predecessor company to Hearst Distribution Group, Inc. ("HDG") was formed in 1979 (the name was changed to HDG in January 1998). In March 2000, Comag was formed, consisting of defendant HDG and Advance Magazine Publishers, Inc. (d/b/a Condé Nast Publications) (the latter is not a defendant in this action). HDG ceased operations as a national distributor in April 2000, and Comag began distributing titles on behalf of publishers at that time. DiFrisco Aff't ¶¶ 22–23. Comag and HDG are therefore considered together on this motion.

cluding any rebates, paid by wholesalers to Hearst Magazine for Hearst Magazine products"); ¶ 7 (terms and conditions of all incentive plans/promotional programs, including RDAs were determined by Hearst Magazine); DiFrisco Aff't ¶ 4 ("Under the express terms of these contracts [with the publishers], the publishers, and *not HDG*, determined the prices and discounts, including any rebates, paid by wholesalers for titles purchased from the publisher."); ¶ 5 ("As a national distributor, HDG never purchased magazines from publishers nor did it ever sell magazines to any wholesalers.").

In opposition, plaintiffs, relying solely on the Alfonsi Declaration, assert that "in late 1995 or early 1996," Frank Herrera, who was president of HDG from January 1998 to April 2000 and is now deceased, announced at a group meeting with "most of the wholesalers in the United States" that no wholesaler would be given any special pricing on publications sold by Defendant HDG, without limiting the announcement to certain publishers or publications. Alfonsi Decl. ¶ 11; DiFrisco Reply Aff't ¶¶ 3, 4. Although Mr. Herrara was, at one time, president of HDG, that was not the case at the time of the statement relied upon in the Alfonsi Declaration; at that point, he was president of an entity not named as a defendant in this action. DiFrisco Reply Aff't ¶ 3. As a result, any statement made by Mr. Herrara in 1995 or 1996 would not be attributable to HDG, and, therefore, would be hearsay. Such a hearsay statement cannot create a genuine issue of material fact in opposition to defendants' motion. Even if the statement were not hearsay, it does not contradict the showing made by Comag/HDG, because, unlike the Curtis letter, it is silent as to the identity of the entity (publishers vs. national distributors) who had decided not to give special pricing.

Finally, in an attempt to create an genuine issue of fact as to the control of pricing, plaintiffs cite to agreements between HDG and certain publishers that provided that "Account prices shall be collected by, and paid to HDG, exclusively." *See, e.g.,* Pls. 56.1 ¶ 6 and Exh. A ¶¶ 670 and 672 (quoting from Hearst Contract, DiFrisco Aff't Exh. 1 ¶ 4(e) & ¶ 5). These same contracts provide, however, that "Prices to be paid by HDG Accounts shall be determined by PUBLISHER. . . ." *See, e.g.,* DiFrisco Aff't Exh. 1 ¶ 4(e). Plaintiffs therefore have failed to raise a genuine issue of material fact with respect to Comag or HDG's control of any prices, except as set forth below with regard to return policies.

### 4. *Time Distribution Services, Inc. and Warner Publisher Services, Inc.*

In support of their motion, defendants TDS and WPS submitted an affidavit from Richard Jacobsen ("Jacobsen Aff't"), President and Chief Executive Officer of TDS and WPS since August 2000.[13] From 1995 to 1999, Mr. Jacobsen served as President and CEO of TDS. Jacobsen Aff't ¶ 3. The Jacobsen Affidavit meets TDS's initial burden of establishing that it is the publishers, and not the distributor defendants, who control the base prices and special incentive programs offered to plaintiff wholesalers. Jacobsen Aff't ¶ 8 (publisher determines the "base price charged to magazine wholesalers" and the cover prices of magazines), ¶¶ 9–10 (special in-

---

**13.** TDS and WPS are each indirect subsidiaries of Time Inc., and perform their services on behalf of Time Inc. and three unaffiliated publishers. Jacobsen Aff't ¶ 4. Because defendants presented evidence with respect to TDS and WPS together, I will consider them together on this motion. As noted previously, TDS does not seek summary judgment with respect to magazines published by Time Inc.

centive, marketing and promotional programs that reduce the base price are controlled by the publishers, and allowances for RDAs are set by publishers).[14]

In response, plaintiffs rely on language in certain contracts that provide, *inter alia,* that WPS was required to "bill and collect all payments from wholesale distributors for Warner's own account and to designate wholesale distributors and other customers." *See, e.g.,* Pls. 56.1 ¶ 6 and Exh. A ¶¶ 73, 85, 96, 129, 151 (citing to various WPS contracts). For the reasons set forth above in relation to the other distributor defendants' assumption of credit risk, this evidence is insufficient to create a genuine issue of material fact on pricing or other terms of sale (except return policies).

### Return Policies

At oral argument, defendants argued that "th[e] issue of discrimination in returns policies is new to the case this morning" (Oral Argument Tr. at 19). But, as previously noted, plaintiffs' Second Amended Complaint asserts a section 2(a) claim based on defendants' allegedly discriminatory return policies.

Defendants acknowledge that they set the actual return policies. *See* Oral Argument Tr. at 21, 25. This was true even in circumstances where the publishers ultimately gave the credits for the returns. Defendants argue, however, that no liability can be imposed based on their administration of those policies because section 2(a) is concerned only with price discrimination in connection with the sale of commodities, and not services. Oral Argument Tr. at 27–28 ("a discrimination on service is not subject to the Robinson–Patman Act, presuming there was such evidence in this case.").[15] Defendants argue that the returns policies are a credit function that the distributors assume as a service to the publishers of the magazines; they urge that it is not a term of sale to the wholesalers, and hence no liability can attach. Oral Argument Tr. at 27–28 (if distributors double-counted returns, "we would be discriminating if it wasn't the ultimate responsibility of the publisher, which it is in this case, but we would be discriminating in a service that we perform. We do not sell magazines, your honor. The publisher sells magazines. We sell a service.").

Plaintiffs have come forward with evidence that defendants control the manner in which returns are counted, and posit that this, in turn, affects the price per copy that plaintiffs pay. *See* Alfonsi Declaration ¶ 14 ("The return policies were an important component of the prices paid by United Magazine ... To the extent that a distributor did not allow a credit for any returned magazines, United Magazine's price per magazine increased."); *see also* Defs. Mem. at 7 ("The wholesalers were

---

**14.** Because I am not relying on Exhibit 59 to the Jacobsen Affidavit, I need not address plaintiffs' motion to strike that exhibit and those portions of the Affidavit that refer to it. Plaintiffs also seek to strike certain of the contracts between TDS and its client publishers on the ground that they were not produced in discovery. As with the Curtis contracts, the evidence submitted in opposition to plaintiffs' motion to strike makes clear that TDS made it known to plaintiffs that they were producing only representative contracts, and not all contracts. Plaintiffs never sought to compel them to produce additional or all contracts. Horvath Aff't in Opposition to Motion to Strike. Plaintiffs' motion to strike certain TDS contracts is denied.

**15.** Although such a holding is not necessarily required by the text of section 2(a), cases have held that "[t]he Act applies only to the sale of goods or commodities, not services." *See Metro Communications Co. v. Ameritech Mobile Communications, Inc.,* 984 F.2d 739, 745 (6th Cir.1993).

billed monthly by the moving defendants ... for the magazines delivered to the wholesalers, less applicable credits, such as magazines not sold by the wholesalers."). I agree with plaintiffs that discrimination in return policies may affect the price they pay for a commodity. Even if the return policies could be viewed as part of a service, it would be a service so dominated by the sale of goods as to be actionable even under such cases as *Metro Communications.* 984 F.2d at 745 ("[T]he Robinson–Patman Act is applicable to transactions that involve the sale of both goods and services only if the 'dominant nature' of the transaction is a sale of goods.").

I conclude that defendants have not met their initial burden of demonstrating that they did not control the terms of the "return policies." Defendants, therefore, are not entitled to summary judgment with respect to any claim based on these policies. If plaintiffs can demonstrate through admissible evidence that the policies were applied in a discriminatory fashion, that those policies affected the price paid by plaintiffs for magazines, that the price differences caused competitive injury, and that plaintiffs have suffered antitrust injury caused by any discrimination, then plaintiffs will have established an actionable violation.

Rule 56(d) empowers this Court to enter "an order specifying the facts that appear without substantial controversy ... and directing such further proceedings in the action as are just. Upon trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly." *See Leddy v. Standard Drywall, Inc.,* 875 F.2d 383, 386 (2d Cir.1989); *Wantanabe Realty Corp. v. City of New York,* 315 F.Supp.2d 375, 404 (S.D.N.Y. 2003); *Riddle v. Claiborne,* 2001 WL 1352456, at *1 (S.D.N.Y. Nov.2, 2001) (recognizing that "[t]here is general agree-ment that a summary judgment cannot be entered for part of a claim" but that Rule 56(d) permits a court to enter an order deeming certain facts established for trial). Because I conclude that all defendants other than Curtis have established that there are no material facts in dispute as to their non-involvement in setting the price charged to plaintiffs—the wholesalers' discount off cover price—and all other terms of sale, except "return policies," those facts are deemed established. As to defendants other than Curtis, plaintiffs' section 2(a) claims may proceed solely upon a claim that defendants' "return policies" resulted in a discriminatory price or term of sale.

## VI. CONCLUSION

For the reasons set forth herein:

1. Plaintiffs' motions to strike are DENIED.

2. The motion of defendant Curtis Circulation Company for summary judgment dismissing plaintiffs' Second Amended Complaint is DENIED.

3. The motions of all other moving defendants for summary judgment dismissing Plaintiffs' Second Amended Complaint are DENIED, except that, pursuant to Rule 56(d), Fed. R.Civ.P., it is ORDERED that the fact of such defendants' non-involvement in the setting of price and terms of sale, except with regard to return polices, is deemed established.

This case is set for a Conference on February 28, 2005 at 11:00 a.m. in Courtroom 12C.

SO ORDERED.